## FALLS MFG. CO. v. W. W. BARBOUR.

Western Section. April 7, 1930.

Petition for Certiorari denied by Supreme Court, July 19, 1930.

Kyser & Allen and Thomas A. McEachern, of Memphis, for appellant.

Crabtree, Crabtree & Harwell, of Memphis, for appellee.

SENTER, J. In this cause the complainant, Falls Manufacturing Company, a corporation of Granite Falls, North Carolina, by the original bill seeks to recover against the defendant, W. W. Barbour, engaged in the cotton business of Memphis on a draft and bill of lading for six bales of cotton.

The bill alleges in substance that on or about the 8th day of August, 1927, the defendant negotiated a certain negotiable shippers

order bill of lading, purporting to have been issued by Illinois Central Railroad Company, at Memphis, for the transportation of six bales of cotton shipped from Memphis, Tennessee, to Granite Falls, North Carolina, for W. N. Pharr & Company, for the sum of $597.66. The bill alleges that said bill of lading and draft were, in due course, through the usual banking channels, presented to and paid by complainant at Granite Falls, North Carolina, and it thereby became the bona-fide purchaser and owner of the said bill of lading, and entitled to receive the six bales of cotton therein referred to. The bill further alleges that the bill of lading was fictitious and a forgery; that it was not, in fact, issued by the I. C. Railroad, or executed by its officer or agents, and that the six bales of cotton therein referred to were not received by said railroad company for transportation.

The bill further alleges that by endorsement and negotiation of said bill of lading, the defendant, under the Act of Congress pertaining thereto (referring to the Federal Uniform Bill of Lading Act of 1916), warranted that the bill of lading was genuine; that he had the right to transfer it, and that he had the right to transfer the title to the property described therein. That by reason of the facts averred, the said warranties were false and that complainant is entitled therefore to recover of the defendant the amount of said draft with interest thereon. It thus appears that complainant's bill predicated its right to recover against the defendant upon the fact that the defendant had endorsed and negotiated the interstate bill of lading, and thereby warranted that the bill was genuine, etc., under the Act of Congress referred to. The answer of the defendant denied that defendant negotiated the shipper's order bill of lading referred to in the bill. The answer denies that the bill of lading referred to was fictitious and a forgery, and not issued by the I. C. Railroad Company, or its agents; and denies that the six bales of cotton were not transported and delivered to complainant. The answer alleges that the defendant, as an accommodation to Walter N. Pharr, who was engaged in the cotton business in the City of Memphis, Tennessee, under the trade name of W. N. Pharr & Company, told Walter N. Pharr that he would advance him the amount of the sale price of the six bales of cotton, which W. N. Pharr & Company, had contracted to ship to the Falls Manufacturing Company, which advance defendant advised said Pharr he would make upon his presentation to defendant of draft drawn by W. N. Pharr & Company, on the Falls Manufacturing Company, with the bill of lading attached for said shipment; and that the defendant left instructions with his stenographer and clerk, authorizing her to make such advance upon presentation of said draft with bill of lading attached; that defendant was not in the City of Memphis on August 8, 1927, when Pharr presented said

draft with bill of lading attached at defendant's office upon which defendant's said stenographer and clerk advanced the amount of said draft to said Pharr and to whom was delivered said draft with bill of lading attached, which draft secured such advance; that defendant's said stenographer and clerk deposited said draft to defendant's account in the bank with which defendant did business; that no authority was given by defendant to his said clerk to endorse said bill of lading or to in any wise guarantee the genuineness thereof, or to make any warranties with respect to the same; that she was only authorized to make said advance or to endorse said draft for deposit or collection, and that said bill of lading was not endorsed by the defendant nor by anyone authorized to bind him in the premises. The answer denies that defendant was the negotiator or transferrer of the bill of lading; and denies that he was the owner of the bill of lading or of the cotton purported to be transported thereby; and that he did not sell, transfer or negotiate said bill of lading. He avers that he was only a mortgagee or pledgee of the bill of lading in question, and was not, therefore, liable under the Federal Bill of Lading Act by any endorsement or warranties or guarantees in regard thereto.

The answer further avers that because of the delay and laches upon the part of complainant complainant is estopped from seeking to hold the defendant liable. Other averments are contained in the answer not necessary to be set out.

There is a finding of the facts by the Chancellor, and also a supplemental finding of facts by the Chancellor contained in the record, and upon which the Chancellor decreed in favor of complainant and decreed a judgment for the amount of the draft with interest from date of same.

From this decree the defendant has appealed to this court and has assigned errors.

There is but little, if any, controversy about the facts, the questions made are principally questions of law concerning the legal status of the defendant, and as to whether the defendant was the negotiator and transferrer of the bill of lading and the draft involved, or whether under the facts the defendant sustained the relation of a pledgee of the bill of lading, holding the same as security for the draft which he cashed for Pharr & Company. And the further question as to whether this transaction brings the case within Section 34 of the Federal Bills of Lading Act, enacted in 1916, effective January 1, 1917, or whether it would be controlled by Section 36 of the same Act. Section 34 of the Act provides as follows:

"A person who negotiates or transfers for value a bill by endorsement of delivery; unless a contrary intention appears, warrants:

"(a) That the bill of lading is genuine.

"(b) That he has a legal right to transfer it.

"(c) That he has knowledge of no fact which would impair its value or worth of the bill.

"(d) That he has a right to transfer a title to the goods, and that the goods are merchantable or fit for the particular purpose, wherever such warranties would have been implied if the contract of the parties had been to transfer without a bill, the goods represented thereby."

Section 36 of the Federal Act provides as follows:

"A mortgagee or pledgee or other holder of a bill for security who in good faith demands or receives payment of the debt for which such bill is security, whether from a party to a draft drawn for such debt or from any other person, shall not be deemed by so doing to represent or warrant the genuineness of such bill or the quantity or quality of the goods therein described."

It is the contention of appellant that both sections 34 and 36 of the Federal Bills of Lading Act are declaratory of the common law, and that under the facts of this case Section 36 above quoted, and not Section 34 controls.

For a proper consideration of the questions of law made, and the application of the facts to the law, it becomes important to set out the material facts as found by the Chancellor, and in which we concur.

It appears that on February 2, 1927, Pharr & Company entered into a contract to ship to complainant, Falls Manufacturing Company, 200 bales of cotton, to be paid for on sight draft with bill of lading attached. On August 8, 1927, Pharr & Company drew a draft for the sum of $597.66, payable to "ourselves," drawn on Falls Manufacturing Company, as the drawee, and attached thereto what purported to be a negotiable shipper's order bill of lading, purporting to have been issued by the I. C. Railroad at Memphis, for six bales of cotton marked "FIGS" from Memphis to complainant at Granite Falls, North Carolina. It also appears that pursuant to a previous arrangement entered into between Pharr & Company, through Walter N. Pharr, and the defendant, W. W. Barbour, that Barbour had agreed for the consideration of 50c per bale to advance to Pharr & Company the money on draft to be drawn for cotton, upon Pharr & Company delivering and turning over to Barbour a sight draft on the drawee with bill of lading attached. On August 8, 1927, Walter N. Pharr presented to Barbour's clerk or stenographer in charge of Barbour's office in Memphis, the sight draft with shipper's order bill of lading attached, purporting to have been issued by the railroad company covering six bales of cotton, purported to have been shipped by Pharr & Company to complainant. The clerk or stenographer in the employ of the defendant received the draft and bill of lading from Pharr, and advanced

to Pharr the amount represented by the draft, less 50c per bale, which seems to have represented the discount or exchange which Barbour charged Pharr under the arrangement; that the stenographer or clerk deposited the draft with the bill of lading attached in the bank where Barbour did business, after endorsing both the draft and the bill of lading in the name of Barbour, and the draft in usual course of banking, was presented to the complainant at Granite Falls, North Carolina, for payment, and the draft was promptly paid on presentation, and the bill of lading and the draft delivered to complainant. When the cotton did not arrive in the usual or ordinary time for transportation from Memphis to Granite Falls, North Carolina, the complainant, on September 20, by letter to Pharr & Company, advised Pharr & Company that the six bales of cotton had not arrived, and requested that Pharr & Company have the shipment traced. Pharr & Company advised complainant that it would proceed to do so. Considerable correspondence passed between Pharr & Company, and complainant with reference to the delay in transit of the shipment, and finally Pharr & Company suggested that complainant draw on them for the amount of the original draft, since the cotton seemed to have been lost. The complainant declined this suggestion, apparently because there had been a considerable advance in the price of cotton, and complainant desired the cotton. It finally developed that the bill of lading was not genuine, but was a forged bill of lading, and that no cotton had been delivered to the railroad company for shipment as represented by the bogus or forged bill of lading. There is nothing in the record to indicate that Barbour in any way participated in the fraud, or that he had any knowledge that the bill of lading was not genuine, until the facts were afterwards developed.

Walter N. Pharr had died before the forgery of the bill of lading had been discovered. Promptly upon the discovery by complainant that the bill of lading attached to the draft which it had paid, and which had been endorsed by the defendant, Barbour, was a forgery and not a genuine bill of lading, and that no cotton had been received by the railroad company under the bill of lading, the complainant notified the defendant, and ultimately demanded that the defendant make good or repay the draft. It also appears from the record that after the death of Pharr the matter was taken up by defendant with the Memphis Cotton Exchange with the view of having Pharr's seat on the Exchange held subject to the amount which Barbour anticipated he would have to repay on the draft. After some correspondence between Barbour and the Memphis Cotton Exchange, the Memphis Cotton Exchange disallowed the claim of Barbour, holding that it was a personal transaction between Barbour and Pharr. Upon the refusal of Barbour to pay to complainant the amount of the draft, the bill in this cause was filed.

The Federal Bill of Lading Act under a similar statement of facts, was construed by the Supreme Court of Oklahoma, in the case of Fort Worth Elevator Co. v. Bank, decided October 9, 1923, and reported in 220 Pac., page 340, and wherein the court said:

"Where a bank receives from a party a draft with bill of lading attached, and the bank gives the party credit for the amount and endorses the bill, and sends it through the usual channels to the party on whom it is drawn, and the same is paid; and the bill proves to be a forgery, said bank is liable to the person on whom it is drawn for the amount paid by him."

The Oklahoma Court, in the case of Bank v. Kemper, 229 Pac., 840, decided in 1924, reaffirmed the above holding.

We have been unable to find where any other court has construed the Federal Bill of Lading Act, wherein the same question was presented, except in the two Oklahoma cases referred to. In construing Section 34 of the Federal Act, the Oklahoma court seems to have proceeded upon the theory that the bank had become the owner of the property represented by the bill of lading when it became the purchaser of the draft.

The contention is made by appellee in the present suit that the title to the property covered by the bill of lading passed to the defendant and he became the owner of the property, the six bales of cotton, evidenced by the bill of lading, and therefore was the negotiator and transferrer within the meaning of the Federal Act. Cases are cited by appellee in its brief to support this contention. (Farmers & Merchants Bank v. Sprout, 179 Pac., 301, 104 Kan., 348; C., R. I. & P. Ry. v. McElhan, 165 N. W., 67, 182 Iowa, 1035; Raimy-Davis Mer. Co. v. Bengarner, 185 Pac., 287, a Kansas case.) In Bank v. Sprout, supra, the court:

"A shipper's negotiation of a bill of lading with attached draft by endorsement and delivery to the bank, vests in a bank title to the goods."

Prior to the passage of the Federal Bill of Lading Act (August, 1916) the question as to whether or not a bank which discounted a draft with bill of lading attached warranted the genuineness of the bill of lading when the same was presented for payment, has been frequently before the courts of the various states and the Supreme Court of the United States.

In the case of Lander v. Lattin, 19 Tex. Civ. App., 246, 46 S. W., 48, the court held that the bank would be liable to the drawee who pays the draft for any breach of the original seller of the goods (the drawer of the bill of exchange). The holding in the Lander case was followed by the North Carolina court in the case of Finch v. Gregg, 126 N. C., 176, and to the same effect and announcing the same doctrine is the case of Haas & Co. v. Bank, 39 S. R., 129; 1

L. R. A. (N. S.), 242; and by the Mississippi Court in the case of Searles v. Grain Co., 32 S. R., 287.

In commenting upon the holding in these cases, Williston, in his excellent work on the law of sales, in discussing sections 36 and 37 of the Uniform Sales Act (which is identical in all of its terms with sections 35 and 36 of the Uniform Bills of Lading Act, and section 35 being almost identical in language with section 34 of the Federal Bills of Lading Act), says:

"A few modern American cases have held that a banker or other person who has discounted a bill of exchange with a bill of lading attached, becomes liable to the drawee who pays the draft for any breach of the original seller of the goods (the drawer of the bill of exchange) of a warranty or contract in regard to them, but most influential courts have refused to accept the novel doctrine.

"The latter decisions are right, for the bank which collects from the drawee of the draft, is not selling the draft or the bill of lading attached thereto, to the drawee, nor is the bank making any representations as to the bill of lading or the goods behind it. It has brought a draft on the drawee with certain papers attached thereto. It says in effect to the drawee: 'Here is a draft upon you, will you pay it or not?' . . . Therefore, even though the bill of lading be a forgery, and without any validity whatever, a bank or other holder receiving payment from the drawee in due course is not liable to repay the money received." (Sec. 435, page 1072).

Whatever may be the rule in other states (Texas, North Carolina, Alabama and Mississippi), this doctrine has been repudiated in many of the states, and by the Supreme Court of the United States, and expressly by the Supreme Court of this State in the well-considered case of Leonhardt v. Small, 117 Tenn., 153, opinion by former Justice Wilkes, and in which opinion the cases of Lander v. Lattin, supra, Finch v. Gregg, supra, Haas & Co. v. Bank, supra, and Searles v. Smith Grain Co., supra, were reviewed, and the court by express language, disapproved the doctrine or rule followed by those cases. In the opinion in the Leonhardt case numerous cases are cited and quoted approvingly from the Supreme Court of the United States and other states, all of them holding that the Lander and other cases following the Lander case proceed upon a false or unsound premise. In the Leonhardt case, our court quotes at length from the case of Hoffman v. National City Bank, 12 Wall. (U. S.), 181, 20 L. Ed., 366, wherein it is said:

"Where bills of exchange are drawn, accompanied with forged bills of lading, and were discounted by a bank, and subsequently accepted and paid by the acceptors, they cannot recover back

from the bank the money paid by them, on the ground of the forgery of the bills of lading, of which the bank was ignorant at the time of their discount.

"Proof that the bills of lading were forgeries could not operate to discharge the liability of the acceptors to pay the amounts to the payees or their endorsee, where the payees were ignorant holders, having paid value for the same in the usual course of business.

"It is immaterial, in that regard, whether the bills were accepted while in the hands of the drawer and at his request, or whether they had passed into the hands of the payee before acceptance, and were accepted at his request."

In the case of Goetz v. Bank of Kansas City, 119 U. S., 551, L. Ed. 515, speaking on this subject, the Supreme Court of the United States said:

"A bank in discounting commercial paper does not guarantee the genuineness of a document attached to it as collateral security. Bills of lading attached to drafts drawn as in the present case are merely security for the payment of the drafts. The endorsement by the bank on the invoices accompanying some of the bills 'for collection' created no responsibility on the part of the bank; it implied no guaranty that the bills of lading were genuine; it imported nothing more than that the goods, which the bills of lading stated had been shipped, were to be held for the payment of the drafts if the drafts were not paid by the drawee, and that the bank transferred them only for that purpose. If the drafts should be paid the drawees were to take the goods."

In commenting upon the above case, appellee very properly points out that in that case the endorsement of the bank stated, "for collection," and he reasons that the case is therefore not in point. However, in the numerous other cases as well as in the Leonhardt v. Small case, it did not appear that the draft was simply forwarded for collection, nor do the courts seem to make any distinction.

We think one of the soundest statements coming from any court of last resort which we have examined is from the Iowa court in the case of Tolerton & Stetson Co. v. Anglo-California Bank. This case is quoted by our Supreme Court in Leonhardt v. Small, and since the citation and reference to the case is not given, we simply state the quotation, as given and as stated in the Leonhardt opinion.

"This case repudiates the doctrine laid down in the cases of Lander v. Lattin Bros., 19 Tex. Civ. App., 246, 46 S. W., 48, and Finch v. Gregg, 126 N. C., 176, 35 S. E., 251, 49 L. R. A., 679, relied upon by the complainants in the case at bar, and re-af-

firms the long established doctrine insisted upon by defendants.
. . .

"These decisions proceed upon the theory that the assignee stands in all respects in the shoes of the assignor, and with this broad doctrine we cannot agree. While the rights of such an assignee are to be measured by those of the assignor, his liability is . not necessarily the same. . . .

"The rule of the Lander case is founded on .the thought that the transfer of the draft and bill of lading to the bank amounted to a sale of the goods, and that the bank as a purchaser undertook to deliver the goods and carry out the canneries company's contract with plaintiff, and because of these facts it necessarily assumed the contract of warranty, although it may have been in fact ignorant that any warranty was made. We do not think, even as the proposition is thus stated, the premises justify the conclusion; but the premises are not correct. The transaction between the canneries company and defendant was not, and could not be, a sale of the goods, for they had already been sold to plaintiff, and it was the intention of all parties that such sale to plaintiff should be consummated by delivery. What was in fact done by the assignment of the draft and bill of lading was to transfer to the bank the canneries company's right to the price, and to give it the possession of the goods as security. Manifestly, while the bank could collect no more than its assignor would have been entitled to, the character of its engagement was not such as to impose upon it any liability to the buyer which it did not expressly assume. . . ."

The Tolerton & Stetson Company case, the Iowa case, in further referring to the Landis (Texas) case, and Finch v. Gregg (the N. C. case) says:

"The two cases cited stand alone in holding the purchaser of the draft with bill of lading attached liable on a warranty made by the assignor, and the line of reasoning pursued to reach this conclusion is so at variance with well established principles of law that we decline to accept the rule they announce."

In the Leonhardt case, our Supreme Court, after reviewing the cases above referred to, proceeds:

"In the cases relied upon by the complainant and followed by the Court of Chancery Appeals, the courts of the states of Texas, North Carolina and Alabama fail to recognize and apply the well-settled principles of commercial law laid down in the foregoing authorities. They erroneously assume that the purchase of a draft with a bill of lading attached was a purchase of the goods represented by the bill of lading, and that a presentation of the draft for payment was a contract by the bank to sell the goods

to the drawee, when, as a matter of fact, the goods had already been sold by the drawer to the drawee, and, as a matter of law, the bill of lading and goods only passed as collateral security for the draft, which was the only thing the bank bought.''

It is thus clear that, in this State and by the decisions of the Supreme Court of the United States and the great weight of authority, that a bank or person who discounts a sight draft with a bill of lading attached, does not become the purchaser or owner of the property covered by the bill of lading, but in such a situation the purchaser of the draft takes the bill of lading as collateral security to the draft. Applying this rule to the instant case, Barbour did not become the owner of the bill of lading or the cotton represented by the bill of lading. This cotton had been sold to the complainant, and delivery to be made to complainant by the seller, Pharr & Co. Barbour occupied the same position as the bank would have occupied had it advanced the money to Pharr & Co., on the draft and had taken the endorsed draft and bill of lading. The bank would not have been the owner of the cotton, nor can it be consistently urged that Barbour became the owner of the cotton. He simply advanced the money to the drawer, Pharr & Co., and received the draft and bill of lading and forwarded the draft and bill of lading attached, in usual banking course, and the draft was paid by the drawee. Nor do we think that the fact that he received for this service the sum of fifty cents per bale, which the record shows to be the usual exchange discount, of approximately $3.50 per thousand dollars, would alter the situation. The courts in considering the cases referred to, did not hold that because the bank charged a discount or exchange, thereby became the purchasers of the goods. Sections 34 and 36 of the Federal Bills of Lading Act must be construed together. We are of the opinion, that Section 34 of the Act is not intended to apply in a case of this kind, but does apply when the transferrer has become the owner of the property by assignment. While Section 36 applies in a case where the draft is discounted and the assignee of the draft delivers the bill of lading as collateral security to the draft, and by Section 36, in such a case the endorser of the draft and bill of lading does not become a guarantor that the bill of lading is genuine. For these reasons, we are of the opinion that the facts of the present case brings it within Section 36 of the Federal Bills of Lading Act, and not within Section 34.

It results that the assignments of error on these questions are sustained. The assignments of error based upon the alleged laches or negligence of complainant in not earlier discovering the fraud of Pharr and that the bills of lading was a forgery, we do not think can be sustained under the facts of the record. In the view we have taken of the case it becomes unnecessary to further comment on the assign-

ments based upon the alleged negligence, delay and laches.

It results that the decree of the Chancellor is reversed and the bill is dismissed at the cost of appellee, including the cost of this appeal. Owen and Heiskell, JJ., concur.